IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PAMELA LAWRENCE,               §
                               §
        Plaintiff,             §
                               §
V.                             §     CIVIL ACTION NO. H-18-2771
                               §
ANDREW SAUL, COMMISSIONER      §
OF THE SOCIAL SECURITY         §
ADMINISTRATION,                §
                               §
        Defendant.             §

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 16) and Defendant's Cross Motion for Summary Judgment (Document No. 14). Having considered the cross motions for summary judgment, each side's response to the other's motion (Document Nos. 17 & 18), the administrative record, the written decision of the Administrative Law Judge dated February 14, 2018, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] On October 13, 2019, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No. 20.

## I. Introduction

Plaintiff Pamela Lawrence ("Lawrence") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for disability insurance benefits and supplemental security income benefits. Lawrence claims in this appeal that: (1) "The ALJ improperly determined Ms. Lawrence's back impairment did not meet the requirements of a listed impairment;" (2) "The ALJ improperly determined Ms. Lawrence's residual functional capacity;" and (3) "The ALJ erred in substituting her own opinion for that of the medical expert." The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's February 14, 2018, decision, that the decision comports with applicable law, and that the decision should be affirmed.

## II. Procedural History

On June 23, 2016, Lawrence filed applications for disability insurance benefits and supplemental security income benefits ("SSI"), claiming that she had been unable to work since March 17, 2015, as a result of depression, herniated discs, a right shoulder injury, and a pinched sciatic nerve (Tr. 221-228). The Social Security Administration denied the applications at the initial and reconsideration stages. After that, Lawrence requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Kelly Matthews, held a hearing on January 3, 2018, at which Lawrence's claims were considered *de novo*. (Tr. 35-77). Thereafter, on February 14, 2018, the ALJ issued her decision finding Lawrence not disabled. (Tr. 12-30).

Lawrence sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 416.1470. On June 7, 2018, the Appeals Council found no basis for review (Tr. 1-3), and the ALJ's decision thus became final.

Lawrence filed a timely appeal of the ALJ's decision. 42 U.S.C. § 405(g). Both sides have filed a Motion for Summary Judgment, each of which has been fully briefed. The appeal is now ripe for ruling.

## III.    Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236

3

(5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991). Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step one that Lawrence had not engaged in substantial gainful activity since March 17, 2015, her alleged onset date. At step two, the ALJ determined that Lawrence had the following severe impairments: depression; anxiety; lumbar degenerative disc disease; sciatica, and osteopenia in the lumbar spine and hips; and that she had the following non-severe impairments: right shoulder injury; neck osteoarthritis; cataracts/glaucoma; seizure disorder; acute renal failure; renal cysts; and history of alcohol abuse. At step three, the ALJ determined that Lawrence did not have an impairment or a combination of impairments that met or equaled a listed impairment, including Listings 1.02, 1.04, 12.04 and 12.06. Prior to consideration of steps four and five, the ALJ determined that Lawrence had the "residual functional capacity to perform work light work as defined in 20 CFR 404.1567(b) and 416.967(b). However, the claimant is limited to no more than occasional stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, and scaffolds. The claimant is further limited to no more than occasional exposure to workplace hazards such as unprotected moving mechanical parts, unprotected heights, and commercial driving. She can understand, remember, and carry out detailed – but not complex – tasks, and she can have only occasional interaction with the public" (Tr. 21). At step four, using that residual functional capacity, and considering the testimony of a vocational expert, the ALJ concluded that Lawrence was capable of performing her past relevant work as a data entry clerk and clerical worker, and that she was, as

a consequence, not disabled.

In this appeal, Lawrence argues that the ALJ erred in the step three assessment of whether she met Listing 1.04. Lawrence also argues that the ALJ erred in determining her RFC insofar as no consideration was made for her shoulder impairment, which the ALJ erroneously found to be non-severe, insufficient consideration was given to the symptoms related to her depression and anxiety, and improper weight was given to the opinion of the testifying expert about Lawrence's ability to use her hands.

In determining whether there is substantial evidence to support the ALJ's decision, including the step three assessment and the RFC determination, the court considers four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren*, 925 F.2d at 126.

## V.    Discussion

### A.    Objective Medical Evidence

The objective medical evidence in the record shows that Lawrence has long-standing issues with depression, anxiety and lumbar back pain, as well as a short-term impairment related to a fracture of her right shoulder.

With respect to Lawrence's mental impairments, the objective medical evidence shows that Lawrence suffers from both anxiety and depression, and claims she has done so since the 1980's. The underlying medical record in this case shows that Lawrence was seen by Dr. Sajjad Zaidi on

August 18, 2014, complaining of worsening anxiety and depression (Tr. 461-62). She reported to Dr. Zaidi that she was feeling sad, depressed, tired, fatigued, and lonely, and that her current medications were not working. Dr. Zaidi diagnosed her with a chronic recurrent depressive disorder and a generalized anxiety disorder, assessed her a GAF of 55-60, and started her on Effexor and Seroquel. Approximately five months later, on January 6, 2015, Lawrence again saw Dr. Zaidi, after having been hospitalized for a seizure in October 2014 (Tr. 464).[2] Lawrence reported at that time that she was feeling overwhelmed by her medical problems, but that her mood was stable with her medications. Dr. Zaidi found Lawrence's affect to be appropriate and her mood, while mildly anxious, was improving. He increased Lawrence's dosage of Effexor and Seroquel. In March 2015, in one telephone contact and one office visit with Dr. Zaidi, Lawrence reported that her daughter had found her unconscious in her apartment, resulting in her hospitalization, and that leading up to that incident she had been stressed about work and drinking heavily (Tr. 467-68).[3] When she returned to work following that hospitalization, she was fired. Dr. Zaidi referred Lawrence to a therapist to work on her stress and her alcohol issues, and continued her on her medication. Over eighteen months later, on September 28, 2016, Lawrence was seen by Dr. Thomas Fletcher at the UTMB Department of Psychiatry and Behavioral Science for an outpatient evaluation of her depression (Tr. 562-66). At that evaluation, Lawrence complained of depression, anhedonia, difficulty sleeping, low energy, low interest and low motivation. Her mood was depressed, and she was currently off her

---

[2] In October 2014, Lawrence was hospitalized after having a witnessed seizure, which lasted minutes and during which she lost consciousness (Tr. 318). All of her diagnostic tests were normal, including a brain CT, and she wholly recovered.

[3] Lawrence was hospitalized from March 5, 2015 through March 7, 2015, with fever and chills, which was diagnosed as a urinary tract infection, alcohol withdrawal, dehydration, and associated acute renal failure (Tr. 330-334).

medications. Upon mental status examination, Lawrence's mood was found to be depressed. She was diagnosed with major depressive disorder, recurrent episode, moderate and generalized anxiety disorder, and was re-started on Effexor and Seroquel. Three months later, on December 21, 2016, Lawrence reported to Dr. Fletcher that she felt as though she was "doing better" and that "her depression is improving somewhat," with her being less irritable, and having improvement in her lack of interest and in her energy level (Tr. 673-76). In connection with a mental status examination, Lawrence's mood was determined to be "better," and she was continued on Effexor and Seroquel.

As for Lawrence's lumbar back pain, the objective medical evidence shows that she was seen in the emergency room on May 14, 2016, complaining of back pain, moderate in degree, in her left lower lumbar spine and left gluteus, that was worse with sitting (Tr. 414-446). Upon physical examination, no limitation was found in the range of motion in her back, and no motor or sensory deficits were found. She was diagnosed with acute non-traumatic pain in the lower back with radiation to the left leg, and was given, upon discharge, prescriptions for Tylenol #3, diazepam, and prednisone. A month later, on June 20, 2016, Lawrence was again seen in the ER, complaining of continued left buttock pain, with intermittent tingling radiating down the buttock to the posterior leg (Tr. 511-513). A physical examination revealed a non-tender back, normal range of motion and a normal gait, and the ability to heel/toe walk without exacerbation of pain. Lawrence was also found to be neurovascularly intact with normal sensation. She was diagnosed with left buttock pain, and lower left extremity radiculopathy, was given a Toradol injection in the ER and was prescribed Tylenol #3 and Flexeril for pain.

Over two months later, on September 2, 2016, she was seen by Dr. Cory Janney for complaints of low back pain (lumbago), which Lawrence described as having started in March 2016,

9

which radiated from her lower back to her left leg and foot, and which she rated as 10/10 (Tr. 520-523). Upon examination, Dr. Janney found that Lawrence had "flexion with the hands to the level of the knees with mild discomfort;" extension "with mild discomfort; tenderness to palpation in her "paraspinal musculature" and in her "SI joints" on the left, with a negative straight leg raise, symmetrical reflexes at the ankles and knees, "5/5 motor in all muscle groups L2-S1 bilaterally;" "sensation [ ] intact in all nerve distributions," and no muscle spasms (clonus). Dr. Janney, upon review of x-rays taken on August 16, 2016, diagnosed Lawrence with lumbar degenerative disc disease "left sided with radicular pain," and prescribed Robaxin. A month later, on October 26, 2016, Lawrence reported that her symptoms had "significantly improved and her low back pain [had] gotten better." (Tr. 542). During a neurological consult with Dr. Daniel Branch on November 21, 2016, Lawrence reported that her pain had been better the last few months with pain medication (Tr. 685-86). Dr. Branch noted Lawrence's leg cramps, back pain, joint stiffness and anxiety/depression, but found that she had 5/5 strength, no weakness, was able to stand on her toes, with no muscle spasms, and no sensory deficits. An MRI reviewed by Dr. Branch revealed a "large concentric disc bulge asymmetric to the left at L4-L5 with a superimposed left paracentral disc protrusion resulting in moderate narrowing of the left lateral recess with suspected impingement of the left descending L5 nerve root." Dr. Branch concluded that Lawrence had "no deficit" and her symptoms were slowly improving. He continued her on her pain medications, recommended physical therapy, and advised her to follow-up with a pain management specialist to consider epidural steroid injections.

On January 4, 2017, Lawrence saw a pain management specialist – Dr. Timothy Bednar (Tr. 664-671). She complained to him about low back pain, slightly worse on the left than the right, with constant, nagging pain, that was occasionally sharp and shooting, and that, at times, radiated down

10

her left side to her feet. At the time of the examination, Lawrence graded her pain as 1/10. A neurological examination revealed that Lawrence's sensation was grossly intact bilaterally; her reflexes in her biceps, brachioradialis, triceps, patella and achilles were all within normal limits, her muscle strength was generally 5/5 in bilaterally in the upper and lower extremities, with 4/5 strength noted in the left lower extremity, her gait was normal, and there was mild tenderness to palpation in the lumbar spine and paraspinal muscles (Tr. 668). Dr. Bednar diagnosed Lawrence with lumbar spondylosis with radiculopathy, lumbar canal stenosis, protrusion of lumbar intervertebral disc, and lumbar facet arthropathy, continued her on her current medications, referred her to physical therapy, and considered the possibility of epidural steroid injections. On January 31, 2017, Lawrence had epidural steroid injections at L4-5 (Tr. 659-661). Upon follow-up on February 16, 2017, Lawrence reported that she was much improved, her pain was more discomfort than pain, and she was not experiencing any radiculopathy (Tr. 646-650). Upon examination, Dr. Courtney Williams recorded that Lawrence's sensation, reflexes, muscle strength and gait were all normal/intact, and that she had only mild tenderness to palpation in her lumbosacral spine. He determined that Lawrence was able to do her activities of daily living.

Finally, the objective medical evidence shows that Lawrence fractured her right humerus on December 2, 2015. That occurred when she fell going to the restroom. She was seen in the emergency room on December 2, 2015 (Tr. 373-409), the fracture was diagnosed, and she obtained follow-up care with Dr. Keith S. Schauder. Those follow-up visits, on December 16, 2015, December 28, 2015, and January 27, 2016, revealed pain and a restricted range of motion in Lawrence's right shoulder (Tr. 472-474). She was given pain medication, and referred for physical therapy (Tr. 472). Lawrence did not do that physical therapy for her shoulder at that time. Instead,

no other follow-up or evaluation of her right shoulder is contained in the record until she was seen by Dr. William Wilson on August 16, 2016, for her complaints of right shoulder and left lower extremity pain and stiffness (Tr. 515-519). X-rays of the right shoulder revealed "mild to moderate glenohumeral osteoarthritis with suspected posttraumatic remodeling of the humeral head" (Tr. 534). Dr. Wilson's physical examination of Lawrence's right shoulder was essentially unremarkable, with there only being some tenderness to palpation, and the strength in the supraspinatus being "4-". All other aspects of the shoulder examination were normal and/or negative. Dr. Wilson diagnosed Lawrence with a history of right proximal humerus fracture, history of right proximal biceps tear, and right shoulder muscular deconditioning (Tr. 518), and referred Lawrence for physical therapy. Lawrence attended five physical therapy sessions for her right shoulder. By the final physical therapy visit on October 13, 2016, Lawrence had full strength in her right upper extremity, her range of motion had significantly improved, and she was describing her shoulder in terms of discomfort, as opposed to pain (Tr. 551-552). A subsequent follow-up visit with Dr. Brian Smith in the orthopedic department at UTMB revealed that her symptoms had "significantly improved. . . [and] she now has near full shoulder ROM [range of motion] and no complaints" (Tr. 542). Her reports of pain at that time were 0/10 (Tr. 547).

In determining that Lawrence was not disabled, the ALJ went through the entire record meticulously, discussing all of the objective medical evidence in connection with her determinations that Lawrence's shoulder impairment was not severe because it appeared to be "an issue in December 2015 and was resolved by October 2016" (Tr. 17), that Lawrence's back impairment did not meet or equal Listing 1.04, and her determination that Lawrence had the RFC for a limited range of light work. That discussion of the objective medical evidence, which is entirely consistent with

12

the objective medical evidence itself, supports the ALJ's conclusions as to Listing 1.04 and Lawrence's RFC. Lawrence argues that there *is* objective medical evidence in the record that she meets Listing 1.04. The ALJ found to the contrary, noting that "[t]he claimant's degenerative disc disease does not meet or medically equal listing 1.04 because [Lawrence] lacks the requisite motor and sensory deficits and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication." (Tr. 18). The testifying medical expert found no documented motor or sensory deficits in Lawrence's medical records. In addition, while a physical therapist noted some minimal motor strength deficits in the lower left extremities (Tr. 652 "4+ in the L3 Quad; L4 Anterior Tibialis; L5 Ext Hallicus Longus and S1 Peroneals"), just four days prior she was found by Dr. Robert McKendall during a neurology consult to have full, 5/5 strength throughout – both in her upper and lower extremities, bilaterally (Tr. 656). The medical evidence, as found by the ALJ, did not demonstrate any sensory or strength deficits that would have supported a finding contrary to that of the ALJ at step three.

As for Lawrence's argument that the ALJ's RFC is not supported by substantial evidence because it does not take into account her shoulder injury and related mobility limitations in her upper extremities, the Court concludes that the objective medical evidence *does* support the RFC. From June 2016 through December 2016, Lawrence complained of significant back pain radiating to her lower extremities. She was referred to a pain management specialist, who she saw in January 2017, and by February 2017, after having had an epidural steroid injection, her radiating pain had resolved, her pain was rated by her as a "1" on a scale of 1-10, she still had some limitations in her lumbar range of motion and there was mild tenderness in her lumbosacral spine, but she had full muscle strength in both her upper and lower extremities, her gait was normal, and she had normal sensation

13

(Tr. 646-650). That objective medical evidence from office visit in February 2017, supports the ALJ's RFC insofar as it takes into consideration her back impairment.

The objective medical evidence also supports the ALJ's RFC as it relates to Lawrence's shoulder injury insofar as it shows that Lawrence's range of motion in her right shoulder was essentially normal as of October 2016 and her pain had all but diminished, with Lawrence, after having physical therapy, being able to reach her arm behind her back, and describing her pain as "discomfort" (Tr. 542, 551, 555, 558) As there is no objective medical evidence that would support greater limitations – particularly as it relate to Lawrence's right shoulder and upper extremities – the objective medical evidence factor supports the ALJ's step three finding, the RFC, and the ultimate determination that Lawrence is not disabled.

## B.     Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*,

770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

Here, there are no expert medical opinions in the record from Lawrence's treating physicians. What is in the record is: (1) a consultative psychological evaluation conducted by Dr. Daniel Sanders; (2) the functional limitation opinions of the state agency physicians who reviewed Lawrence's medical records; and (3) the expert medical opinion of Dr. Subramaniam Krishnamurthi, who testified at the administrative hearing before the ALJ. With respect to the functional limitations found by the ALJ in the RFC, they are generally consistent with the medical expert opinions about Lawrence's physical functioning. There is only one aspect of one medical expert's opinion about Lawrence's physical functioning that the ALJ rejected. Dr. Krishnamurthi testified about Lawrence's physical limitations, as follows:

> Lift frequently 10 pounds, occasionally 20 pounds; sitting six out of eight-hour period; stand and walk generally for two out of eight-hour period; use of the upper extremities, on the right upper extremity, reaching above head is occasional; and handling, fingering, feeling, grasp, are all frequently on the right. Left upper extremity, no limitations. Then also no ladders, scaffolds, or ropes, Climb ladders – or climb stairs, bend, stoop, crawl, crouch, these are all occasional. And those are the restrictions.

(Tr. 62). The ALJ generally accepted Dr. Krishnamurthi's opinion, but rejected that part of his opinion that limited Lawrence's ability for frequent handling, fingering, feeling, and grasping on the right. According to the ALJ in her decision,

> The undersigned affords Dr. Krishnamurthi's opinion no weight, as there is no objective evidence that the supports deficits with the claimant's hands, and he limited her ability to finger, feel, and grasp. Even the claimant's attorney, at the hearing,

15

could not find any support for that limitation. The subsequent brief submitted by the attorney focuses on the claimant's shoulder impairment which the undersigned does not find causes any of the hand limitations assessed by the medical expert. Furthermore, the claimant's shoulder issue resolved according to the medical evidence and, during the hearing, she raised it up to her head and testified that she just had some strength issues and could not put it behind her to fasten her bra. Therefore, Dr. Krishnamurthi's opinion is unsupported by the medical evidence within the record *and* the claimant's own testimony. The claimant did not testify that she had any restrictions with her hands.

(Tr. 26). That rejection of Dr. Krishnamurthi's opinion about Lawrence's ability to use her hands

– particularly her right hand – is thorough, reasoned, and supported by the record. Nowhere is there

any objective medical evidence that would support a conclusion that Lawrence has functional

limitations related to her hands. In addition, Lawrence did not testify, and there is nothing in the

daily activity reports Lawrence completed, that would give rise to any functional limitation related

to Lawrence's hands. The ALJ, therefore, properly rejected that part of Dr. Krishnamurthi's opinion.

As the ALJ discussed and considered the remainder of the expert medical opinions in the record in

formulating Lawrence's RFC, the diagnosis and expert medical opinion factor also weighs in favor

of the ALJ's step three determination, the ALJ's RFC, and her ultimate disability determination.

## C.  Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the

claimant's testimony and corroboration by family and friends. Not all pain and subjective symptoms

are disabling, and the fact that a claimant cannot work without some pain or discomfort will not

render him disabled. *Cook,* 750 F.2d at 395. In an appeal of a denial of benefits, the Act requires

this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms

is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant.

*Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

16

Lawrence testified at the hearing on January 3, 2018, that she has worked part time as a cashier at Lowe's since September 2017, that in performing that job she has difficulty bending down and getting up, that she cannot stoop or squat, that she has poor balance because of her back pain and back spasms, that the pain in her lower back radiates down through her calf to her ankle, with that radiating pain occurring 20 out of 30 days of the month, that the pain in her back necessitates her shifting positions every thirty minutes or so, that it is hard for her to get into a car because of the bending involved, that any cleaning she does lasts no more than 30-45 minutes, and that the range of motion and strength in her right shoulder is diminished (Tr. 38-39, 46, 54). As for her depression, Lawrence testified that it affects her ability to focus and concentrate, affects her pace and her ability to stay on task, and leads to her feeling overwhelmed, which then leads to her making mistakes (Tr. 57-59). The ALJ considered Lawrence's testimony and her subjective complaints about the severity of her impairments, but found that it was fully credible, In doing so, the ALJ wrote:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

* * *

> The undersigned has taken the claimant's impairments, as well as her subjective complaints, into account in arriving at the residual functional capacity above. These facts in the record do not dispute that the claimant has conditions, which singly or in combination, may cause her pain and/or discomfort. What these pieces of evidence suggest is that the claimant's symptoms may not be accurately reported, may not exist at the level of severity assumed by the claimant's testimony at [the] hearing and may have other mitigating factors against their negative impact on the claimant's ability to engage in work activity. The above residual functional capacity, as determined by the undersigned, gives adequate weight to the facts as determined supported by the objective medical evidence.

As outlined above, the record reflects that the claimant has a history of musculoskeletal complaints that include lumbar degenerative disc disease, sciatica, and osteopenia in the lumbar spine and hips. Radiologic studies of the lumbar spine from August 2016 revealed multi-level spondylosis, most severe at L5-S1. The claimant was assessed to have left-sided low back pain with left-sided sciatica. X-rays of her left hip revealed mild joint space narrowing, and she was assessed to have mild bilateral hip osteoarthosis. As outlined above, there are a couple of instances during the adjudicatory period that the claimant had tenderness to palpation in her lumbar spine and paraspinal muscles, discomfort with range of motion, and slightly decreased strength in her left lower extremity. However, for the most part, her records consistently indicate that the claimant had full muscle strength in her extremities, grossly intact sensation, full 5/5 motor function, and normal reflexes. Despite her allegation at he hearing that she uses a cane as needed, there is no evidence that one has been prescribed to her, and physical exam findings consistently indicate that she had a normal gait and station. Treatment records from November 2016 indicate that she was even able to stand on her toes. The undersigned considered the objective radiologic evidence of the claimant's musculoskeletal issues in limiting her to the light level of exertion, and the occasional objective evidence of tenderness to palpation and a limited spinal range of motion in limiting her to no more than occasional postural maneuvers. The undersigned further considered the claimant's remote history of a seizure and the occasional findings of slightly decreased sensation in her left lower extremity in limiting her to no more than occasional exposure to hazards (i.e., unprotected moving mechanical parts, unprotected heights, and commercial driving).

The undersigned also considered the claimant's depression and anxiety in assessing her residual functional capacity. As outlined above, records from the claimant's treating source(s) reflect that the claimant had intact cognition and memory, and her fund of knowledge was appropriate for her age and education level. They reflect that the claimant had a calm, cooperative, pleasant, and polite attitude, and no problems with her speech. She was noted to have a depressed mood with an appropriate affect at a September 2016 visit. They indicate that [ ] she was alert and fully oriented, and she had a good attention span and concentration. Notes from her April 2016 psychological consultative exam indicate that, although she had a flat affect and depressed mood, she was cooperative and friendly. Rapport with the examiner was established with moderate effort. She was able to repeat the names of 3/3 objects that were verbally presented, and recall all 3 after a short delay. She displayed some difficulty with simple oral and written language skills. She was not able to repeat the phrase "no ifs and or buts." She was able to correctly write a simple sentence that used a verb and a subject. Naming appeared to be intact, as she was able to correctly name 2/2 objects presented. She was able to complete all steps of a 3-step verbal command, and she was able to follow a written command. Her academic functioning was in the low average range, and she obtained an IQ score of 80 on the WAIS-IV.

She put forth good effort and was not very distractible. She had not problems with attention/concentration. She was able to correctly spell "world" backwards, and she had no difficulty following commands. She was able to complete all steps of a 3-step verbal command, and she was able to follow a written command. She was not able to correctly draw 2 pentagrams with a slight overlap. The undersigned finds the record, in addition to the fact that she has successfully maintained part-time employment, supports an ability to handle detailed – but not complex – tasks and occasional interaction with the public. There is no evidence within the record to indicate the claimant's mental or physical impairments preclude the residual functional capacity assessment above.

While the claimant's impairments could be reasonably expected to produce the symptoms alleged, her complaints suggest a greater severity of impairment that can be shown by the objective medical evidence alone. In such instances, the regulations provide that the following factors must be considered: 1) the claimant's activities of daily living, 2) the location, duration, frequency, and intensity of pain or other symptoms, 3) precipitating and aggravating factors, 4) the typ, dosage, effectiveness, and side effects of medications taken to alleviate pain or other symptoms, 5) treatment, other than medication, for relief of pain or other symptoms, 6) any measures other than medication used to relieve pain or other symptoms, 7) any other factors concerning functional limitations and restrictions due to pain or other symptoms produced by medically determinable impairments. The claimant's statements about symptoms, evidence submitted by treating, examining, or consulting physicians or psychologists, and third party observations may also be considered. The claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. Although the claimant has received some treatment for the allegedly disabling impairment(s), that treatment has been essentially routine and/or conservative in nature. The claimant has been prescribed and has take appropriate medications for the alleged impairments, which weighs in the claimant's favor, but the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms.

Although the claimant has described daily activities which are fairly limited in her hearing testimony, two factors weigh against considering these allegations to be strong evidence im favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(Tr. 22, 27-29) (internal references omitted).

Credibility determinations, such as that made by the ALJ in this case in connection with Lawrence's subjective mental complaints, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert. denied*, 514 U.S. 1120 (1995). Here, the ALJ supported her credibility determination with references to the medical evidence and the generally conservative and routine treatment Lawrence received. Because no improper factor was relied upon in making this credibility determination, the subjective complaints factor also supports the ALJ's RFC and the ultimate disability determination.

## D. Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

Here, at the time of the administrative hearing before the ALJ, Lawrence was 63 years old, she had a high school education, and had past relevant work as a data entry clerk, a clerical worker, and administrative clerk, and accounting clerk, and a contract administrator (Tr. 64). Taking these vocational factors into consideration, the ALJ questioned a vocational expert about whether a person of Lawrence's age, education, past work experience, and RFC could perform her past work. The vocational expert, Cassandra Humphries, testified that such a person would be able to perform their past relevant work as a data entry clerk and clerical worker. (Tr. 65-66).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Here, given the objective medical evidence in the record, cited to by the ALJ, which supported the ALJ's step three finding, and the RFC assessment, the vocational expert's testimony constitutes substantial evidence to support the ALJ's step four determination that Lawrence can engage in her past relevant work as a data entry clerk and clerical worker. As such, the vocational factor also supports the ALJ's decision.

## VI. Conclusion and Order

Based on the foregoing and the conclusion that the decision of the Commissioner is supported by substantial evidence and that the decision comports with applicable law, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 14) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 16) is DENIED, and the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 10th day of March, 2020.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE